UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ALEXIA AGNANT,

                        Plaintiff,

                                                        **MEMORANDUM AND ORDER**
        - against -                                      17-cv-3349 (RRM) (SIL)

CSC HOLDINGS, LLC,

                        Defendant.
---------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, Chief United States District Judge.

        Plaintiff Alexia Agnant brings this action against CSC Holdings, LLC, alleging violations

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Civil Rights Act

of 1866, 42 U.S.C. § 1981, based on disciplinary action taken against her and other conduct by

CSC employees while she worked for CSC.  (Compl. (Doc. No. 1).)  Before the Court is CSC's

motion for summary judgment.  (Notice of Motion (Doc. No. 49).)  For the reasons explained

below, CSC's motion is granted in part and denied in part.

## BACKGROUND

### I.    Factual Background

        The relevant facts outlined below are drawn from the parties' Local Rule 56.1 Statements

of Material Facts, as well as evidence submitted by the parties in connection with the motion for

summary judgment.  Unless otherwise noted, the facts are undisputed.

        Plaintiff Alexia Agnant is a black woman born in Jamaica.  (Plaintiff's Response to

Defendant's Rule 56.1 Statement ("Pl.'s Resp. SOF") at ¶¶ 3–4 (Doc. No. 49-15); Defendant's

Rule 56.1 Statement of Material Undisputed Facts ("Def. SOF") at ¶¶ 3–4 (Doc. No. 49-9).)

Defendant CSC Holdings, LLC, is a provider of broadband, telephone, cable television, and

other services, and is a subsidiary of Altice USA, Inc.  (Pl.'s Resp. SOF at ¶¶ 1–2; Def. SOF at

¶¶ 1–2.)  Agnant was hired by CSC in December 2006 as an inbound sales representative.  (Pl.'s

Resp. SOF at ¶¶ 13–14; Def. SOF at ¶¶ 13–14.)  Agnant now works as a direct sales

representative for CSC, a job she has held since August 12, 2014.  (Pl.'s Resp. SOF at ¶ 16; Def.

SOF at ¶ 16.)  As a direct sales representative, Agnant sells CSC's products door-to-door.  (Pl.'s

Resp. SOF at ¶ 18; Def. SOF at ¶ 18.)  Agnant is partially compensated by commission and has

frequently had some of the highest sales figures in her CSC office.  (Pl.'s Resp. SOF at ¶¶ 16, 26;

Def. SOF at ¶¶ 16, 26.)

### A.  Fee Waivers in May 2015

Agnant transferred to CSC's Jericho office on or about April 1, 2015.  (Pl.'s Resp. SOF at

¶ 20; Def. SOF at ¶ 20.)  There, she reported to Direct Sales Supervisor Joe Nicolosi, who in turn

reported to CSC's Manager of Long Island West Direct Sales, Matthew Haggerty.  (Pl.'s Resp.

SOF at ¶¶ 21–22; Def. SOF at ¶¶ 21–22.)  Nicolosi was Agnant's supervisor until at least the end

of 2015.  (Agnant Dep. (Doc. No. 49-2) at 166.)

In May 2015, it was CSC's policy to charge customers $9.95 for every "outlet" a

customer ordered after the first three.  (Pl.'s Resp. SOF at ¶ 38; Def. SOF at ¶ 38.)  An "outlet"

on a CSC Sales Order Form is the wiring required to connect a single cable box to CSC's

service.  (Pl.'s Resp. SOF at ¶ 37; Def. SOF at ¶ 37.)  As Agnant acknowledges, it was also

CSC's policy that sales representatives had to obtain the approval of a supervisor to waive outlet

fees for customers.  (Pl.'s Resp. SOF at ¶ 39; Def. SOF at ¶ 39.)

On May 5, 2015, Agnant waived an outlet fee for a sale, noting on the Sales Order Form

that she had received approval to do so.  (Pl.'s Resp. SOF at ¶¶ 45–46; Def. SOF at ¶¶ 45–46.)

Then, on May 9, 2015, Agnant waived outlet fees for two more customers.  (Pl.'s Resp. SOF at ¶

47; Def. SOF at ¶ 47.)  Agnant maintains that she had supervisor approval to waive the May 5th

outlet fee, but acknowledges that she did not have supervisor approval to waive the May 9th outlet fees.  (Pl.'s Resp. SOF at ¶¶ 45–47.)

When asked by manager Matthew Haggerty about the May 9th Sales Order Forms on May 12, 2015, Agnant told Haggerty that she had tried to reach her supervisor, Joe Nicolosi, to get approval to waive the outlet fees, and when she could not reach Nicolosi, she had falsely written that he approved the waivers.  (Pl.'s Resp. SOF at ¶¶ 57–59; Def. SOF at ¶¶ 57–59.) Agnant told Haggerty that in the past she would contact other supervisors to get waiver approvals when she could not reach Nicolosi, but had not done so on May 9th.  (Pl.'s Resp. SOF at ¶ 60; Def. SOF at ¶ 60.)  Haggerty and Human Resources Manager Erica Simon prepared a final written warning for Agnant regarding her failure to get approval for the fee waiver.  (Pl.'s Resp. SOF at ¶ 62; Def. SOF at ¶ 62.)  Haggerty gave Agnant the final written warning on May 19, 2015.  (Pl.'s Resp. SOF at ¶ 61; Def. SOF at ¶ 61.)  The final written warning issued to Agnant states that it is "From" Haggerty and Nicolosi.  (Smith Decl. (Doc. No. 49-2), Ex. L.)

The final written warning stated that Agnant was receiving a warning "for issuing additional outlet credits on 3 different sales without prior supervisor approval."  (Pl.'s Resp. SOF at ¶ 63; Def. SOF at ¶ 63.)  The final written warning also stated that Nicolosi had spoken with Agnant after the first waiver on May 5th "and advised [Agnant] that [her] actions were not acceptable and could not happen again."  (*Id.*)

CSC contends based on Haggerty's sworn declaration that Haggerty spoke to Nicolosi before issuing the final written warning and that Haggerty believed, based on this conversation, that Nicolosi had advised Agnant not to make additional unapproved waivers after the May 5th waiver.  (Pl.'s Resp. SOF at ¶¶ 65–66; Def. SOF at ¶¶ 65–66; Haggerty Decl. at ¶ 19.)  Agnant, however, denies that Nicolosi spoke to her after the May 5th sale and states that she had approval

3

for that fee waiver.  (Pl.'s Resp. SOF at ¶ 64; Def. SOF at ¶ 64.)  CSC further contends based on Haggerty's declaration that Haggerty "would have drafted the final written warning even if Plaintiff's misconduct had consisted solely of the falsification of the two May 9, 2015 Sales Order Forms."  (Pl.'s Resp. SOF at ¶¶ 65–66; Def. SOF at ¶ 65–66.)

Agnant consistently received positive reviews from her supervisors for her work at CSC. (Plaintiff's Rule 56.1 Counter-Statement ("Pl. SOF") at ¶ 42 (Doc. No. 49-16); Defendant's Response to Plaintiff's Rule 56.1 Counter-Statement ("Def.'s Resp. SOF") at ¶ 42 (Doc. No. 49-18).)  CSC does not have a progressive discipline policy, meaning employees may receive final written warnings for first infractions, depending on the seriousness of the action.  (Pl.'s Resp. SOF at ¶ 44; Def. SOF at ¶ 44.)  Prior to receiving her final written warning, Agnant was eligible for President's Club benefits at CSC, which included a $6,000-10,000 bonus and a trip to Aruba, based on her sales performance over the prior year.  (Pl. SOF at ¶¶ 45–46; Def.'s Resp. SOF at ¶¶ 45–46.)  As a direct result of the final written warning, Agnant received a rating of "requires improvement" on her 2015 year-end review.  (Pl.'s Resp. SOF at ¶ 41; Def.'s Resp. SOF at ¶ 42.)  In turn, because she received a "requires improvement" rating, Agnant was made ineligible for the President's Club benefits she would have otherwise received.  (Pl.'s Resp. SOF at ¶ 68; Def. SOF at ¶ 68.)

### B.  CSC's Discipline of Other Employees

Stacey Marcus is a Caucasian woman who held the same position as Agnant at CSC. (Pl.'s Resp. SOF at ¶¶ 72, 77; Def. SOF at ¶¶ 72, 77.)  On August 12, 2015, Marcus waived an outlet fee without obtaining approval from her supervisor, Ray Villorente.  (Pl.'s Resp. SOF at ¶ 72; Def. SOF at ¶ 72.)  Immediately after waiving the fee, Marcus informed her supervisor of that she had waived an outlet fee without approval.  (Pl.'s Resp. SOF at ¶ 74; Def. SOF at ¶ 74.)

Marcus received only a written warning from her supervisor Ray Villorente and manager Matthew Haggerty for her violation, not a *final* written warning.  (Pl.'s Resp. SOF at ¶ 75; Def. SOF at ¶ 75; Asahguii Decl. (Doc. No. 49-14), Ex. 14.)  Marcus's supervisor Ray Villorente states that Marcus only waived outlet fees without his approval this one time while he was her supervisor.  (Villorente Decl. (Doc. No. 49-7) at ¶ 15.)  Agnant also contends that Joseph Scheriff, another CSC employee who Agnant states is Caucasian, waived outlet fees without approval on May 17, 2015.  (Pl.'s Resp. SOF at ¶ 78; Pl. SOF at ¶ 142; Def.'s Resp. SOF at ¶ 142.)  According to CSC, Scheriff waived an outlet fee without approval only once and subsequently informed his supervisor that he had done so.  (Def.'s Resp. SOF at ¶ 142.)  Like Marcus, Scheriff received only a written warning.  (*Id.*)

### C.  Racially Offensive Comments

Although Agnant's sales work largely took place outside the office, she stated at her deposition that she was in the CSC office "twice a week, every week."  (Agnant Dep. at 134.)  Agnant testified that every day she was in the office, Nicolosi made racially and sexually offensive comments about her hair, nails, and appearance in order to insinuate that Agnant was a "ghetto black woman."  (*Id.* at 134–35, 166.)  According to Agnant, Nicolosi would comment on her long, multi-colored fingernails, ask if her hair extensions were "from a dead person," and tell her that she would look better if she took out her braids.  (*Id.* at 115, 134–5.)  Agnant also reports that Nicolosi called her "Sheneneh."  (Pl.'s Resp. SOF at ¶ 113; Def. SOF at ¶ 113.)  Agnant maintains that Nicolosi made these comments every time she saw him during the approximately eight months he was her supervisor.  (Agnant Dep. at 166.)  CSC does not dispute that Nicolosi generally made these comments to Agnant, but instead contends that they were neither racially nor sexually insensitive.  (Pl. SOF at ¶ 139; Def.'s Resp. SOF at ¶ 139.)

Agnant went out on FMLA leave in February 2016, and when she returned on May 24, 2016, began reporting to Direct Sales Supervisor Hugh Johnson.  (Pl.'s Resp. SOF at ¶ 23; Def. SOF at ¶ 23.)  In September 2018, Agnant moved to CSC's Bethpage, New York office and began reporting to Direct Sales Supervisor Ray Villorente.  (Pl.'s Resp. SOF at ¶¶ 24–25; Def. SOF at ¶¶ 24–25.)

### D.  Right to Sue Letter

On July 14, 2016, Agnant filed a complaint with the New York State Division of Human Rights alleging race and sex discrimination and retaliation by CSC.  (Smith Decl., Ex. G.)  Agnant cross-filed her complaint with the EEOC.  (Compl. at ¶ 15; Answer (Doc. No. 21) at ¶ 15.)  The EEOC issued a right to sue letter on or about February 24, 2017.  (Compl. at ¶ 16; Answer at ¶ 16.)  Agnant alleges she received the letter on or about March 6, 2017.  (Compl. at ¶ 16.)

### II.     Plaintiff's Claims

Agnant filed the instant action against CSC on June 5, 2017, bringing claims for alleged violations of Title VII, 42 U.S.C. § 1981, New York State and City Human Rights Laws, as well as claims for intentional infliction of emotional distress and negligent hiring, retention, and supervision.  (Compl.)  Pursuant to a stipulation between the parties, Agnant voluntarily dismissed with prejudice all but her Title VII and § 1981 discrimination and hostile work environment claims and her Title VII sexual stereotyping claim.  (Order of 12/19/2019 (Doc. No. 22).)

### III.    Motion for Summary Judgment

CSC now moves for summary judgment on all of Agnant's remaining claims.  (Notice of Motion.)  CSC first argues that Agnant has failed to establish a prima facie case of

discrimination under Title VII or § 1981.  (Defendant's Memorandum of Law in Support

("Mot.") (Doc. No. 49-10) at 13.)  CSC maintains that neither the final written warning issued to

Agnant nor any alleged excessive scrutiny of Agnant's work constituted adverse employment

actions.  (*Id.* at 14–16.)  Agnant argues in response that the final written warning constituted an

adverse employment action because it resulted in her losing a monetary bonus and a trip to

Aruba she would have otherwise received.  (Plaintiff's Memorandum of Law in Opposition

("Opp. Mot.") (Doc. No. 49-11) at 9.)

 CSC next argues that Agnant cannot make out a prima facie case for discrimination

because she has not provided evidence that the adverse employment action occurred under

circumstances giving rise to an inference of discrimination.  (Mot. at 16–17.)  In response,

Agnant points to evidence that Caucasian colleagues who committed her same infraction –

Stacey Marcus and Joseph Scheriff – did not receive similarly harsh penalties, and to a history of

racially and sexually insensitive comments made by CSC management, including her direct

supervisor, Joe Nicolosi.  (Opp. Mot. at 9.)  CSC counters that Stacey Marcus and Joseph

Scheriff engaged in less significant conduct than Agnant and did not have the same supervisors

as Agnant, and therefore are not proper comparator employees.  (Mot. at 17, 24–26; Defendant's

Memorandum of Law in Further Support ("Reply Mot.") (Doc. No. 49-17) at 9.)  CSC adds that

Scheriff was disciplined by a different manager than Agnant and that Agnant has not provided

information about Scheriff's race or color.  (Reply Mot. at 9–10.)  With respect to Agnant's

evidence of offensive comments by Joe Nicolosi, CSC argues that Nicolosi's comments were

race- and sex-neutral and, furthermore, because Nicolosi did not "play a meaningful role in

[Agnant's] receipt of a final written warning," his conduct "could not give rise to an inference of

discrimination."  (Mot. at 23–24.)  CSC also argues that even if Agnant does make out a prima

facie case of discrimination, the evidence is not sufficient to show that CSC's stated basis for issuing the final written warning was pretextual.  (Mot. at 17–26; Reply Mot. at 8.)

Next, CSC argues that it is entitled to summary judgment on Agnant's Title VII and § 1981 hostile work environment claims.  (Mot. at 28.)  Once again, CSC maintains that the comments Agnant attributes to Nicolosi and others at CSC are "facially race-neutral and sex-neutral."  (*Id.* at 29.)  Furthermore, CSC argues that even if the comments were not race and sex-neutral, they were not severe enough to support a hostile work environment claim.  (*Id.* at 32.) CSC adds that any excessive scrutiny of Agnant's work was in fact coaching for minor failings that did not impact Agnant's work performance.  (Mot. at 29.)  Agnant argues in response that she suffered frequent, discriminatory comments from Nicolosi, and that she suffered emotional harm due to the criticism from Nicolosi and others.  (Opp. Mot. at 7–8.)

Finally, CSC argues that it is entitled to summary judgment on Agnant's Title VII sexual stereotyping claim because Agnant does not provide evidence she was discriminated against for gender non-conforming behavior.  (Mot. at 26–28.)  CSC argues that Joe Nicolosi's comments regarding plaintiff's appearance did not relate to Agnant's failure to conform to female stereotypes, and that Agnant establishes no link between Nicolosi's comments and any adverse employment action.  (*Id.* at 27–28.)  Agnant does not address these arguments in her opposition brief.  (Opp. Mot.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it may impact the "outcome of the suit under

the governing law." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed," and the Court must draw all "justifiable" or reasonable inferences in favor of the non-moving party.  *Anderson*, 477 U.S. at 255 (citation omitted); *see also Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("[T]he court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions . . . in the light most favorable to the party opposing the motion."  (citations omitted)).

Once the moving party has demonstrated that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted) (citation omitted); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (collecting cases and stating that the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation").  In other words, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

The Court bears in mind that in discrimination cases "'smoking gun' evidence of discriminatory intent is rare and most often must be inferred."  *Forsyth v. Fed'n Employment & Guidance Serv.*, 409 F.3d 565, 569 (2d Cir. 2005) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)), *abrogated on other grounds*, *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007).  Accordingly, the Second Circuit has "repeatedly emphasized 'the need for

caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent.'" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).

## DISCUSSION

### I.   Agnant's Title VII and § 1981 Discriminatory Disparate Treatment Claims

#### A.  *McDonnell Douglas* Framework

Courts evaluate Title VII discrimination claims based on allegations of disparate treatment under the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–805 (1973).  Courts use the same framework when evaluating discrimination claims under § 1981.  *See Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004); *Whethers v. Nassau Health Care Corp.*, 956 F.Supp.2d 364, 383 (E.D.N.Y. 2013) ("The *McDonnell Douglas* analysis applies to both Title VII discrimination claims and claims under § 1981.").

The *McDonnell Douglas* burden-shifting framework requires that the plaintiff first prove a prima facie case of employment discrimination.  After a plaintiff states a prima facie case of discrimination, the burden shifts to the employer to provide "a legitimate, non-discriminatory reason for its actions."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802).  If the employer satisfies this burden, the plaintiff must then establish that the employer's explanation is a pretext for discrimination.  *Velez v. SES Operating Corp.*, No. 07-CV-10946 (DLC), 2009 WL 3817461, at *11 (S.D.N.Y. Nov. 12, 2009).

To state a prima facie case of discrimination, a plaintiff must provide evidence that (1) she belongs to a protected group; (2) she was qualified for the position she held; (3) her

employer took adverse action against her; and (4) that adverse action occurred under circumstances giving rise to an inference of discrimination. *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The burden of stating a prima facie case is "not onerous," *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and is often described as "*de minimis*." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001).

In its motion, CSC does not dispute that Agnant makes out the first two elements of a prima facie discrimination case – that she belongs to a protected group and that she was qualified for the position she held. (Mot. at 14.) CSC argues that Agnant cannot make out a prima facie discrimination claim because (1) she did not suffer an adverse employment action and, (2) even if she did, the adverse action did not occur under circumstances giving rise to an inference of discrimination. (*Id.* at 14–16.)

### B. Adverse Employment Action

An adverse employment action is a "material adverse change in the terms and conditions of employment." *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks omitted). Negative performance evaluations generally do not, on their own, constitute adverse employment actions; however, they may constitute adverse employment actions when they trigger negative consequences for the employee such as a diminution of wages or a loss of benefits. *See Gibbs v. New York State Dep't of Taxation & Fin.*, No. 04-CV-905 (FB) (LB), 2009 WL 754307, at *6 (E.D.N.Y. Mar. 20, 2009) ("A negative evaluation can only constitute an 'adverse employment action' where it leads to tangible employment consequences, such as a loss in pay."); *Antonmarchi v. Consol. Edison Co. of New York*, No. 03-CIV-7735 (LTS) (KNF), 2008 WL 4444609, at *13 (S.D.N.Y. Sept. 29, 2008),

*aff'd*, 514 F. App'x 33 (2d Cir. 2013) ("Since Plaintiff was allegedly denied a wage increase because of the negative evaluation, and the negative evaluation was issued in response to the disciplines, Plaintiff has demonstrated that he suffered an adverse employment action."); *cf. Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 17 (2d Cir. 2011) (summary order) ("While negative employment evaluation letters or reprimands may be considered adverse employment actions," that is not so where there is "no proof that th[e] evaluation had any effect on the terms and conditions of [the plaintiff's] employment." (internal quotation marks omitted) (citations omitted)).

Agnant maintains that she suffered an adverse employment action when CSC gave her a final written warning in response to waiving outlet fees without approval. (Opp. Mot. at 9.) There is no dispute that, because CSC gave Agnant a final written warning for the unapproved outlet fee waivers, Agnant's 2015 year-end performance rating was downgraded to "requires improvement" and she was rendered Agnant ineligible for benefits that included a $6,000-10,000 bonus and a trip to Aruba. (Pl. SOF at ¶¶ 45–46; Def.'s Resp. SOF at ¶¶ 45–46; Pl.'s Resp. SOF at ¶ 68; Def. SOF at ¶ 68.) The final written warning and the evaluation it triggered thus automatically brought substantial negative consequences to Agnant's conditions of employment, including a loss of pay and benefits. This is sufficient for a plaintiff to demonstrate she has suffered an adverse employment action. *See Antonmarchi*, 2008 WL 4444609 at *13 ("Since Plaintiff was allegedly denied a wage increase because of the negative evaluation, and the negative evaluation was issued in response to the disciplines, Plaintiff has demonstrated that he suffered an adverse employment action."). Agnant has demonstrated she suffered an adverse employment action when she received a final written warning from CSC in May 2015.

### C.  Inference of Discrimination

To make out the fourth element of a prima facie case, a "plaintiff can establish an inference of discrimination through direct evidence of discriminatory intent, or through circumstantial evidence demonstrating that the employer treated the plaintiff less favorably than a similarly situated employee outside of his protected group." *Renaud v. Fed. Exp. Corp.*, No. 10-CV-4261 (LB), 2012 WL 34089, at *4 (E.D.N.Y. Jan. 6, 2012).  A plaintiff "may also satisfy this fourth element by demonstrating, *inter alia,* that the employer criticized plaintiff's performance in 'ethnically degrading terms,' or made 'invidious comments about others in the employee's protected group,' or otherwise demonstrated bias in 'the sequence of events leading to the plaintiff's discharge.'" *Velez v. SES Operating Corp.*, No. 07-CV-10946 (DLC), 2009 WL 3817461, at *8 (S.D.N.Y. Nov. 12, 2009) (quoting *Abdu–Brisson*, 239 F.3d at 468).

A plaintiff seeking to raise an inference of discrimination based on disparate treatment of comparator employees must show that she was "'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Graham*, 230 F.3d at 39 (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997)).  "Whether two employees are 'similarly situated in all material respects' is determined 'based on (1) whether they were subject to the same workplace standards and (2) whether the conduct for which [they were] discipline[d] was of comparable seriousness.'" *Dotson v. City of Syracuse*, 763 F. App'x 39, 42 (2d Cir. 2019) (quoting *Graham*, 230 F.3d at 40).  In the final analysis, courts have explained that this standard requires a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases," *id.* at 43 (quoting *Graham*, 230 F.3d at 40), or an "objectively identifiable basis for comparability." *Graham*, 230 F.3d at 40 (quoting *Cherry v.*

*American Tel. & Tel. Co.*, 47 F.3d 225, 229 (7th Cir. 1995). "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham*, 230 F.3d at 39.

CSC argues that Marcus and Scheriff are not proper comparators to Agnant because they were not subject to the same workplace standards as Agnant and engaged in less serious violations of CSC policy than Agnant. (Mot. at 25.)

### 1. Similarity of Workplace Standards

The fact that Agnant did not share the same direct sales supervisor as Marcus and Scheriff does not preclude a finding that she was subject to the same workplace standards as these employees. CSC and Agnant agree that it was Agnant's manager, Matthew Haggerty and others in CSC management who decided to issue Agnant a final written warning – not Agnant's direct sales supervisor Joe Nicolosi. (Pl.'s Resp. SOF at ¶ 61; Def. SOF at ¶ 61.) Under CSC's progressive discipline policy, it was primarily up to Haggerty and others in CSC management to determine whether to issue Agnant's final written warning. (Pl.'s Resp. SOF at ¶ 44; Def. SOF at ¶ 44.) In fact, CSC emphasizes Nicolosi's limited involvement in Agnant's discipline elsewhere in its motion in order to argue that his history of harassing comments does not raise an inference that Agnant's claimed adverse employment action was motivated by discrimination. (Mot. at 28.)

Based on the foregoing, and CSC's open-ended progressive discipline policy, whether Agnant had the same *manager* as her proposed comparators – not direct supervisor – might reasonably determine whether she was subject to the same workplace standards as the comparators. *Cf. Berube v. Great Atl. & Pac. Tea Co.*, 348 F. App'x 684, 686 (2d Cir. 2009) (summary order) (plaintiff and proposed comparators' different supervisors did not preclude finding that they were subject to the same workplace standards where plaintiff offered evidence

that the employees were subject to the same progressive discipline policy).  And in fact, Agnant and Marcus both received their warnings from manager Matthew Haggerty.  (Pl.'s Resp. SOF at ¶ 75; Def. SOF at ¶ 75; Asahguii Decl., Ex. 14.)  Agnant has thus presented evidence sufficient for a jury to conclude that she and Marcus were subject to the same workplace standards.

Scheriff, on the other hand, appears to have had a different supervisor *and* manager than Agnant.  (Asahguii Decl., Ex. 13.)  Agnant provides no argument as to why, in the absence of a shared supervisor or manager, she would be subject to the same workplace standards as Scheriff.  As CSC points out in its motion, Agnant also has not provided information regarding Scheriff's race or color.  (Reply. Mot. at 9.)  Accordingly, the Court finds insufficient basis for a jury to conclude that Scheriff is a proper comparator employee for Agnant.

### 2.  Seriousness of Conduct

CSC also argues that Marcus engaged in less serious conduct than Agnant because she only waived outlet fees without permission only one time, and informed her supervisor soon after she did so.  (Mot. at 17.)  In contrast, CSC notes, Agnant was issued a final written warning only when CSC management believed she had made three unapproved waivers, and that she had made two of those unapproved waivers after being counseled no to do so by Nicolosi.  (*Id.* at 17–18.)

While these are substantial differences, a reasonable jury could conclude that the relevant offense is not the *number* of unapproved waivers, or whether a direct supervisor claimed to have previously counseled the employee about unapproved waivers, but rather whether it was the employee's first time being disciplined for the relevant offense.  In *Dotson v. City of Syracuse*, a female police department employee was given a five-day suspension for insubordination after an argument with a superior in which she insisted that she would be arriving late and leaving early

15

due to a parking shortage, and then subsequently refused to end the conversation and return to her desk when asked.  763 F. App'x 39 (2d Cir. 2019).  The Second Circuit held that a district court erred in determining that the employee could not base her disparate treatment argument on a comparator male police officer who was given a lesser punishment after loudly and rudely confronting a colleague about loud music in direct contravention of his superior's order not to deal with the matter himself.  The Court noted that, while the plaintiff's infraction of being "insubordinate" to a superior may have sounded less severe than the comparator's infraction of "discourteousness" to a colleague, a reasonable juror could conclude that the underlying conduct was sufficiently similar – both having acted in "defiance of a supervisor's direct order."  *Dotson*, 763 F. App'x at 42–44.  In so holding, the Second Circuit cautioned against "overstat[ing] this Court's similarity requirements," explaining that the standard only required a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases."  *Id.* at 43 (quoting *Graham*, 230 F.3d at 40).

Here, a jury could focus on the fundamental similarity between the seriousness of Agnant and Marcus's conduct – that both were being formally disciplined for the first time for issuing unapproved waivers – and reasonably determine the other dissimilarities identified by CSC are not material.  This is particularly true given Agnant's testimony that she only made unapproved waivers because she did not know it was a genuinely impermissible practice.  Agnant testified that she ultimately waived the outlet fees after she could not reach Nicolosi because "that's the practice in the office" and "[t]hat's what everyone does."  (Agnant Dep. at 55.)  If a jury credited this belief, it could reasonably conclude that it is not material that Agnant made two (or three) unapproved waivers while Marcus made one.

16

For much the same reason, a jury could disregard CSC's evidence that Haggerty believed Nicolosi had counseled Agnant about unapproved waivers at the time he issued the final written warning.  (Pl.'s Resp. SOF at ¶ 65; Def. SOF at ¶ 65.)  While Haggerty's beliefs about Agnant's conduct are important in the disparate treatment analysis, CSC does not provide evidence of what specifically Haggerty believed Nicolosi had said in this meeting with Agnant.  This means a factual dispute remains as to whether Haggerty believed based on his conversation with Nicolosi that Nicolosi had disabused Agnant of any belief that unapproved waivers were not a serious violation of CSC's rules.  (*Id.*)

Lastly, a reasonable jury could conclude that it is not material that Marcus immediately disclosed the mistake to her supervisors.  As Agnant suggests in her Response to Defendant's Rule 56.1 Statement of Facts, the fact that Marcus immediately told her supervisor after making an unapproved waiver is consistent with Agnant's claim that such waivers, while against CSC rules, were not seen as a violation warranting serious discipline.  (Pl.'s Resp. SOF at ¶ 74.)

Because the number of times an employee had been formally disciplined for unapproved waivers could constitute an "objectively identifiable basis for comparability," a reasonable jury could conclude that Agnant and Marcus engaged in conduct of sufficiently similar seriousness to support Agnant's disparate treatment claim.  *Graham*, 230 F.3d at 40 (quoting *Cherry v. American Tel. & Tel. Co.*, 47 F.3d 225, 229 (7th Cir. 1995).

### D.  Non-Discriminatory Basis for CSC's Actions

Since Agnant has made out a prima facie discrimination case, the burden shifts back to CSC to articulate a non-discriminatory basis for its adverse employment action against Agnant. Under the *McDonnell Douglas* framework, it is not the Court's duty to "pass judgment on the soundness or credibility" of a defendant's stated basis for its actions, but rather to determine

whether the reasons given are sufficiently "'clear and specific'" to raise a genuine issue of material fact related to the discrimination claim. *Velez*, 2009 WL 3817461, at *11 (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003)).

CSC states that Agnant was issued a final written warning because CSC "believed that she violated its policy prohibiting falsification of Sales Order Forms on three occasions" by waiving outlet fees without supervisor approval. (Mot. at 17.)  This is a sufficiently "clear and specific" reason for the adverse employment action to raise a dispute of material fact as to whether CSC discriminated against Agnant. *See Velez*, 2009 WL 3817461, at *11 (quoting *Mandell*, 316 F.3d at 381).  Taken as true, CSC's basis for issuing Agnant a final written warning would provide a nondiscriminatory reason for the decision.

### E.  Showing of Discriminatory Intent

Because CSC has provided a non-discriminatory basis for its adverse employment action, the burden shifts back to the plaintiff to show that the adverse action was in fact motivated in part by discriminatory intent. *See Abdu-Brisson*, 239 F.3d at 469.  Although plaintiffs often seek to show that the stated reason was wholly pretextual, that is not required. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010) ("In proving a case under Title VII, following the defendant's proffer of a justification, a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus.").  In making this showing, the plaintiff may rely on the same evidence used to establish the prima facie case in order to establish that the employer's explanation is pretextual. *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) ("Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." (internal

quotation marks omitted) (citations omitted)); *see also Quartey v. Schiavone Const. Co. LLC*, No. 11-CV-2037 (DLI) (CLP), 2014 WL 1276476, at *6 (E.D.N.Y. Mar. 27, 2014).  Ultimately, "[i]n order to defeat summary judgment . . . , the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997) (citations omitted); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008) (After the defendant has offered a non-discriminatory reason for its actions, the plaintiff must show, "without the aid of the presumption, [that she] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the [adverse employment action] was based, at least in part, on [a discriminatory basis].").

Agnant points to a history of racially insensitive remarks by her direct supervisor, Joe Nicolosi, as evidence that CSC's decision to issue her a final written warning was based in part on race.  (Opp. Mot. at 9.)  Agnant worked doing sales door-to-door, but testified that she goes into the office two times per week.  (Agnant Dep. at 134, 166.)  She testified that when she visited the office, Nicolosi would insinuate she was a "ghetto black woman," by commenting on her hair and long nails.  (*Id.* at 134–35.)  According to Agnant, Nicolosi made these comments about Agnant's appearance "every time [she] saw him."  (*Id.* at 134.)  He repeatedly asked her if her hair was "from a dead person" and told her to take out her braids because they did not "look good."  (*Id.* at 115, 135.)  Finally, Agnant alleges that Nicolosi called her as "Sheneneh."  (Pl.'s Resp. SOF at ¶ 113; Def. SOF at ¶ 113.)

CSC claims that Nicolosi's alleged comments were race-neutral because "people of different races paint their nails and braid their hair."  (Mot. at 24.)  While the Court recognizes

that people of all races braid their hair, it must also consider the comments in the context Agnant alleges. *See, e.g.*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam) (explaining that a "speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage."). Facially race-neutral words or themes can provide strong evidence of discriminatory animus. *See Lloyd v. Holder*, No. 11-CV-3154 (AT), 2013 WL 6667531, at *9 (S.D.N.Y. Dec. 17, 2013) ("The Court recognizes that certain facially non-discriminatory terms can invoke racist concepts that are already planted in the public consciousness."). Agnant alleges that Nicolosi specifically commented on her hair and her long nails. As Agnant herself testified, these remarks were made in order to imply that she looked like a "ghetto black woman." (Agnant Dep. at 134.) A reasonable jury could find support for this alleged implication in the allegation that Nicolosi referred to Agnant as "Sheneneh," in what could be found to have been a reference to Martin Lawrence's character Sheneneh Jenkins from the television show *Martin*, a well-known comedic parody of a black woman.[1]

The relevance of remarks by an employee involved in the decision-making process "does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 116 (2d Cir. 2007), *abrogated on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Based on the facts Agnant alleges, a reasonable jury could find Nicolosi's alleged persistent comments about Agnant's hair, nails, and appearance

---

[1] *See, e.g.,* https://en.wikipedia.org/wiki/Martin_(TV_series)#Main_characters (last visited May 20, 2020). The Court takes judicial notice of this fact as it is "generally known within [this Court's] territorial jurisdiction." Fed. R. Evid. 201(b). *See, e.g.*, *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 155 F. Supp. 2d 1, 41, n.71 (S.D.N.Y. 2001), *aff'd in part and remanded on other grounds*, 277 F.3d 253 (2d Cir. 2002) (taking judicial notice of the "nurturing of the gifted Luke Skywalker by Obi–Wan ("Ben") Kenobi in *Star Wars*" as "a matter of common and general knowledge in [the court's] jurisdiction" (citing Fed. R. Evid. 201(b))).

provide evidence that Nicolosi harbored racially discriminatory attitudes toward black people in general, and Agnant in particular.

CSC argues that these comments by Nicolosi are not probative of whether Agnant was discriminated against because Nicolosi did not "play a meaningful role in her receipt of a final written warning." (Mot. at 24.)  As discussed in the previous section, CSC's position on Nicolosi's role in Agnant receiving the final written warning is somewhat muddled.  While it is undisputed that Agnant's manager Matthew Haggerty and other CSC managers ultimately decided to issue the final written warning, (Pl.'s Resp. SOF at ¶ 62; Def. SOF at ¶ 62), CSC simultaneously argues that Marcus's discipline for unapproved waivers is not comparable to Agnant's because she did not have Nicolosi has her direct sales supervisor.  (Mot. at 17.)

The Second Circuit has explained that the significance of discriminatory remarks in support of a discrimination claim must be evaluated on a spectrum.  "The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." *Tomassi*, 478 F.3d at 115. Here, the final written warning issued to Agnant includes Nicolosi's name, along with Haggerty's, on the Warning's "From" line.  (Smith Decl., Ex. L.)  Moreover, Nicolosi was Agnant's direct supervisor, with whom she was supposed to approve fee waivers, and Haggerty claims to have spoken to Nicolosi – and relied in part on Nicolosi's statement – before reaching the decision to give Agnant a final written warning.  (Haggerty Decl. at ¶ 18.)  Drawing all inferences in the Agnant's favor, as the Court must, the Court concludes that Nicolosi was sufficiently close to the adverse action against Agnant for a reasonable jury to find that Nicolosi's comments were evidence of a potentially discriminatory state of mind influencing Agnant's workplace discipline.  *See Tomassi*, 478 F.3d at 115.

Although Agnant provides additional circumstantial evidence of discrimination, the Court need not review it.  Agnant, a high-performing salesperson with no substantial disciplinary record, found herself being issued a final written warning within two months of transferring to CSC's Jericho office and having Joe Nicolosi assigned as her supervisor.  (Pl.'s Resp. SOF at ¶¶ 20, 21; Def. SOF at ¶¶ 20,21; Pl. SOF at ¶ 42; Def.'s Resp. SOF at ¶ 42.)  From the time she began reporting to Nicolosi to six months after the discipline, Agnant testifies that she was subjected to continuous comments from Nicolosi about her appearance that were meant to imply she was a "ghetto black woman."  (Agnant Dep. at 134.)  Given Nicolosi's role as Agnant's supervisor, and his closeness to the disciplinary action taken against her, a reasonable jury could find based on Nicolosi's comments and the Stacey Marcus comparator evidence that Agnant was issued a final written warning at least in part due to her race.  *See Holcomb*, 521 F.3d at 141.  Material disputes of fact preclude summary judgment on Agnant's Title VII and § 1981 discrimination claims.

## II.      Hostile Work Environment Claims

### A.   Applicable Law

Under Title VII, plaintiffs may bring claims based on a discriminatory hostile work environment.  *See AMTRAK v. Morgan*, 536 U.S. 101, 116 (2002).  Similarly, § 1981 provides a cause of action for employment discrimination in the form of a racially hostile work environment.  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000).  Courts generally apply the same standard for § 1981 hostile work environment claims and Title VII hostile work environment claims.  *Id.*

 "In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that 'the workplace is permeated with discriminatory

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gorzynski*, 596 F.3d at 102 (quoting *Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir. 2006)).  "A plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Id.*

In determining whether a plaintiff has made a showing of a hostile work environment, the Court is "required to look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citations omitted) (internal quotation marks omitted).  Critically, a "plaintiff must link the hostile conduct to her protected characteristics." *Bacchus v. New York City Dep't of Educ.*, 137 F. Supp. 3d 214, 240 (E.D.N.Y. 2015).  "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (alteration omitted) (internal quotation marks omitted) (citation omitted).

### B.  Hostile Work Environment at CSC

Agnant's strongest evidence of a hostile environment at CSC is her account of comments made by her supervisor, Joe Nicolosi.  As discussed in the previous section, Agnant testified that Nicolosi commented on her hair, nails, or general appearance every time she saw him during her twice-weekly trips to the office.  (Agnant Dep. at 134–35, 166.)  In summarizing Nicolosi's behavior, Agnant testified that "[e]very single time" she saw Nicolosi at the office, he

commented on her hair, nails, and appearance in order to "insinuate[] that [she] was a ghetto black woman." (Agnant Dep. at 134.)  Moreover, Agnant alleges that Nicolosi referred to her as "Sheneneh," in what could be found to have been a reference to a comedic parody of a "ghetto" black woman played by Martin Lawrence.[2] (Pl.'s Resp. SOF at ¶ 113; Def. SOF at ¶ 113.)

CSC argues that it is entitled to summary judgment because the comments Agnant alleges were (1) race-neutral, and (2) not sufficiently severe or pervasive to support a hostile work environment claim. (Mot. at 30–32.)  For reasons outlined in the previous section, a reasonable jury could find that these comments were racially hostile.  The history of comments Agnant describes is also sufficiently pervasive so as to preclude summary judgment on this claim. Agnant began reporting to Nicolosi when she arrived in the CSC Jericho office on April 1, 2015. (Pl.'s Resp. SOF at ¶ 20; Def. SOF at ¶ 20.)  She continued reporting to Nicolosi for at least eight months, (Agnant Dep. at 166), and alleges that he directed the above racially hostile remarks each time she saw him on her twice-weekly visits to the office.  Agnant thus alleges more than "a few isolated incidents of racial enmity," but rather the sort of "steady barrage of opprobrious racial comments" that constitutes a racially hostile work environment. *Schwapp v. Town of Avon*, 118 F.3d at 110.  If Agnant's testimony were credited by the jury, Nicolosi's actions could be found to constitute an environment of discriminatory insult sufficiently severe or pervasive so as to be objectively hostile and abusive.  *See Gorzynski*, 596 F.3d at 102; *see also Edwards v. Town of Huntington*, No. 05-CV-339, 2007 WL 2027913, at *4 (E.D.N.Y. July 11, 2007) (ten racially offensive remarks by employee's *de facto* supervisor over period of eleven months raises triable question of fact precluding summary judgment on hostile work

---

[2] *See* note 1, *supra*.

environment claim).  Accordingly, Agnant's Title VII or § 1981 hostile work environment claims survives summary judgment.

### III.     Title VII Sexual Stereotyping Claim

Title VII's bar against discrimination based on sexual stereotyping was firmly established by the Supreme Court's *Price Waterhouse v. Hopkins* decision.  490 U.S. 228 (1989).  Sexual stereotyping claims protect "individuals who fail or refuse to comply with socially accepted gender roles."  *Dawson v. Bumble & Bumble*, 398 F.3d 211, 218 (2d Cir. 2005), *overruled on other grounds*, *Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018), *cert. granted sub nom. Altitude Exp., Inc. v. Zarda*, 139 S. Ct. 1599, 203 L. Ed. 2d 754 (2019).  Since the decision, courts have noted that "[t]he principle of *Price Waterhouse* . . . applies as much to the supposition that a woman *will* conform to a gender stereotype (and therefore will not, for example, be dedicated to her job), as to the supposition that a woman is unqualified for a position because she does *not* conform to a gender stereotype."  *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 119 (2d Cir. 2004).  "The hallmark of sex stereotyping 'rests on a belief that an employee of one gender either cannot or must not possess or display qualities stereotypically associated with perceptions and expectations of how the other gender should or should not look or behave.'"  *E.E.O.C. v. Grief Bros. Corp.*, No. 02-CV-468S, 2004 WL 2202641, at *14 (W.D.N.Y. Sept. 30, 2004) (quoting *Dawson v. Bumble & Bumble*, 246 F. Supp. 2d 301, 314 (S.D.N.Y. 2003)).

CSC argues that Agnant has provided no evidence in support of this sexual stereotyping claim.  (Mot. at 26–27.)  Agnant does not respond to this argument, and her opposition brief makes no mention of her sexual stereotyping claim.  (Opp. Mot.)  In her complaint, however, Agnant contends that CSC had "sexually stereotyped Ms. Agnant in violation of Title VII

through verbal statements . . .  because of [its] perception of how a woman should act, the responsibilities women should perform, and how [CSC] believe[s] women should be treated." (Compl. at 9.)

The Court finds no evidence in the record to support Agnant's sexual stereotyping claim. Although Agnant has put forth evidence that Nicolosi made comments about her appearance, none of these comments could reasonably be found to relate to Agnant's conformance or non-conformance with stereotypes about women.  The rest of the record is devoid of evidence related to sexual stereotyping.  CSC is thus entitled to summary judgment on Agnant's Title VII sexual stereotyping claim.

## CONCLUSION

For the reasons set forth above, CSC's motion for summary judgment is denied with respect to Agnant's Title VII and § 1981 discrimination and hostile work environment claims, and is granted with respect to Agnant's Title VII sexual stereotyping claim.  CSC's request for an award of costs and attorney's fees, (Mot. at 32), is denied.

This action is recommitted to the assigned magistrate judge for all remaining pretrial proceedings, including settlement discussions as appropriate.

SO ORDERED.

Dated: Brooklyn, New York
     May 20, 2020

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge

26